IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| PAUL K. COMISKEY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. 09-0252 |
| | : | |
| MICHAEL J. ASTRUE, | : | |
| Commissioner of Social Security, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM**

YOHN, J.                                                              January __, 2010

      Plaintiff, Paul K. Comiskey, appeals the decision of the Commissioner of Social Security

(the "Commissioner") denying his applications for a period of disability and disability insurance

benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and for

supplemental security income ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383f.

Plaintiff filed a motion for summary judgment, seeking to have the case remanded "for a full and

fair hearing that considers all of the available evidence" (Br. in Support of Pl.'s Mot. for Summ.

J. ["Pl.'s Br."] 19), and the court thereafter referred the matter to a magistrate judge.  The

magistrate judge has issued a report and recommendation ("R & R") recommending that the

plaintiff's motion be granted in part and denied in part and that the case be remanded to the

Commissioner so that the record can be developed further in certain areas.  The Commissioner

has now filed objections to the R & R, arguing that the Administrative Law Judge ("ALJ")

fulfilled his duty to assist the *pro se* plaintiff in developing the record, and adequately explained

his decision to reject certain opinion evidence from a consultative psychologist who examined

plaintiff. Plaintiff has not filed a response. Upon consideration of the R & R, the Commissioner's objections thereto, the summary judgment briefing, and the entire administrative record, and for the reasons set forth herein, the court will adopt the recommendations of Magistrate Judge Linda K. Caracappa and remand the case to the ALJ for further consideration consistent with this memorandum.

## I.    Facts and Procedural History

Plaintiff, born on July 11, 1963, is forty-six years old. (R. 29.) He has a high-school education (R. 29-30), and his past employment includes work as a laborer/contractor, a paper machine helper, a stock clerk, and a maintenance person for apartment complexes, among other things (R. 31-35, 171, 177-84). In 2003, plaintiff was stabbed in the abdomen during a robbery of which he was the victim. (*See* R. 46, 208.) Plaintiff underwent surgery for his injuries at Temple University Hospital in 2003 and 2004 (R. 46, 208, 248),[1] and he appears not to have had any sort of stable employment since that time (*see* R. 184). Plaintiff also has a history of mental health issues.[2]

On October 24, 2006, plaintiff filed applications for DIB and SSI, alleging a disability with an onset date of March 10, 2006. (R. 9.) Plaintiff described his disability as a "[w]ound infection, back and shoulder problems, [and] mental issues." (R. 170.) In connection with his

_____

[1] On November 27, 2003, plaintiff underwent an "exploratory laparotomy with loop sigmoid colostomy, presacral drainage, distal rectal wash-out, appendectomy, rigid proctoscopy with cystoscopy and repair of bladder times two." (R. 208.) On January 26, 2004, plaintiff was again admitted to the hospital for a "loop colostomy takedown." (R. 248.)

[2] Plaintiff testified that he was incarcerated from 1989 to 1999, during which time he suffered what he described as a "nervous breakdown" for which he received mental health treatment. (*See* R. 30-31, 65-66, 281.) As discussed in greater detail *infra*, plaintiff more recently has been diagnosed with bipolar disorder. (R. 54-55.)

claims, plaintiff was examined by two separate consultative examiners at the request of the state agency: Alvin Elinow, Ph.D., a psychologist, and Javad Abdollahian, M.D., a practitioner of internal medicine. (R. 13, 270-85.)

In a report dated February 1, 2007, Dr. Abdollahian noted that plaintiff complained primarily of an inability to lift, pull, and push due to the scarring and pain from his prior abdominal surgery, and also complained of injuries to both hands, hypertension, attention-deficit disorder, spinal deformities, and low back pain. (R. 270.) Following a physical examination, Dr. Abdollahian listed his final diagnoses of plaintiff as (1) "[l]arge scar in the abdomen from umbilical to suprapubic area"; (2) "[m]orbid obesity by 15 pounds"; and (3) "[a]ttention-deficit disorder," and concluded that plaintiff had "multiple subjective complaints with very minimal objective finding."[3] (R. 272.) In particular, Dr. Abdollahian found that plaintiff was able to move all of his extremities very well without limitation and had a normal range of motion and gait with no neurological abnormalities. (*Id.*) He went on to conclude that plaintiff was capable of lifting and carrying up to twenty-five pounds "frequent[ly]"; had no limitations with respect to standing and walking, sitting, or pushing and pulling; and could perform "occasional" bending, kneeling, stooping, and crouching, and "frequent" balancing and climbing. (R. 273-74.)

Dr. Elinow also issued a report, dated February 6, 2007, reflecting the results of his

---

[3] As to plaintiff's hand injuries, Dr. Abdollahian noted that plaintiff had "all movements of the fingers and hand was all normal." (R. 272.) As to his complaint that he "was told to have hypertension," Dr. Abdollahian noted that plaintiff's blood pressure was "normal," 120/80 without medication. (R. 270-71.) And regarding spinal deformities, Dr. Abdollahian observed that no x-ray or MRI was available to evaluate that complaint due to plaintiff's lack of health insurance, but that on physical examination, the spine appeared straight with "[n]o deformity, no kyphoscoliosis, and no lordosis noted." (R. 270.) X-rays of plaintiff's lumbar spine were later taken in January 2008, which revealed "[d]egenerative disc changes at the L4-L5 disc level." (R. 310.)

mental status examination of plaintiff.  (*See* R. 279-85.)  In his report, Dr. Elinow listed plaintiffs

multiaxial diagnoses as follows:

| | |
|---|---|
| AXIS I: | Bipolar disorder type I. |
| AXIS II: | |
| AXIS III: | Health problems noted are stomach and digestive problems as well as undiagnosed back and shoulder problems. |
| AXIS IV: | Stressing factors are unemployment, present family stressors are considered to be high, and he also suffers from a mood disorder. |
| AXIS V: | GAF is approximately 50 to 55. |

(R. 282.)  Dr. Elinow concluded that plaintiff found it difficult to obtain employment due to a

number of factors, including "physical problems from a severe stomach injury about 3 years ago,

ongoing severe family stressors due to problems with his wife who has emotional problems,

financial problems that may result in him being homeless in a few months, as well as an inability

to obtain long-term employment because of his felony conviction, for which he served about 10

years in prison."  (R. 283.)  He also reported that plaintiff was having "a great deal of difficulty

with social relationships, mood swings and his health problems."  (*Id.*)  Based on his

examination of plaintiff, Dr. Elinow found that his impairments did not affect his ability to

understand, remember, and carry out short, simple instructions, but had a "[s]light" effect on his

ability to understand, remember, and carry out detailed instructions and to make judgments on

simple work-related decisions.  (R. 284.)  He also concluded that plaintiff's impairment had a

"[s]light" effect on his ability to interact appropriately with the public and co-workers and a

"[m]oderate" impact on his ability to interact appropriately with supervisors and to respond

appropriately to work pressures and changes in a usual or routine work setting.  (*Id.*)  Dr. Elinow

also noted that plaintiff's poor social skills would affect his relationship to co-workers.  (R. 285.)

Following these evaluations, state agency medical consultants prepared both a physical

and a mental residual functional capacity assessment of plaintiff.  (R. 286-91, 305-07.)  The

physical residual functional capacity assessment, prepared by Vinaykant N. Shah, M.D., on

February 21, 2007, found that the medical evidence in the record[4] established a "medically

determinable impairment of [history of] stab wound rectum/abdomen."  (R. 291.)  Dr. Shah

found that plaintiff was limited to lifting or carrying fifty pounds "[o]ccasionally" and twenty-

five pounds "[f]requently."  (R. 287.)  Dr. Shah also concluded that plaintiff could sit, stand,

and/or walk for about six hours in an eight-hour workday, but that he otherwise had no physical

limitations.  (R. 287-89.)  The mental residual functional capacity assessment, prepared by Frank

M. Mrykalo, Ed. D., on February 28, 2007, similarly concluded that the medical evidence

established a medically determinable impairment of "Bipolar, Adhd, [and] Polysubstance

Abuse."  (R. 307.)  Based on the record evidence, Dr. Mrykalo found that plaintiff was

"[m]oderately [l]imited" in several respects as a result of his impairment.[5]  (R. 305-06.)  He

nevertheless concluded that plaintiff appeared to be reasonably capable of "performing simple,

routine type tasks; coping with minor work [related] stressors; [and] comprehending and

---

[4] At the time the physical and mental residual functional capacity assessments were completed, the medical evidence in the record appears to have consisted of records from Temple University Hospital concerning plaintiff's treatment for his stab wound in late 2003 and early 2004 (R. 207-64); records for the period from September 18, 2006, to January 16, 2007, from Philadelphia Health Center #10, where plaintiff had been seen for physicals and evaluations (R. 265-69; *see also* R. 172-73); and the reports of Drs. Abdollahian and Elinow (R. 270-85).

[5] In particular, Dr. Mrykalo found plaintiff to be "[m]oderately [l]imited" in his ability (1) to understand and remember detailed instructions, (2) to carry out detailed instructions, (3) to maintain attention and concentration for extended periods, (4) to make simple work-related decisions, (5) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length or rest periods, (6) to interact appropriately with the general public, (7) to accept instructions and respond appropriately to criticism from supervisors, and (8) to respond appropriately to changes in the work setting.  (R. 305-06.)

retaining simple task instructions," and was therefore "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." (R. 307.)

Plaintiff's DIB and SSI applications were denied on March 2, 2007 (R. 98-107), and he thereafter requested a hearing before an ALJ (R. 110-11). Although plaintiff had retained counsel to represent him in obtaining Social Security benefits prior to requesting a hearing (*see* R. 108-09), he appeared *pro se* at the May 7, 2008, hearing (R. 21-23),[6] at which, he, his wife, and a vocational expert testified.

By the time of the hearing, several additional records pertaining to plaintiff had been added to the record, including (1) a two-page Pennsylvania Department of Public Welfare "Employability Assessment Form" completed in March 2007 by Leonardo B. Arevalo, M.D., of Wedge Medical Center, a psychiatrist who had treated plaintiff, reporting that plaintiff was temporarily disabled as a result of his mental health issues,[7] precluding employment for a period of twelve months or more (R. 308-09); (2) a one-page report regarding a series of x-rays of plaintiff's lumbar spine, taken on January 14, 2008, finding "[d]egenerative disc changes at the L4-L5 disc level" (R. 310); and (3) a May 5, 2008, note from Michael Lo Bianco, D.O., a family practice doctor, stating that plaintiff was under his care for "[b]ipolar [d]isorder, tendonopathy [r]ight shoulder, [l]umbar degenerative disc disease and neuropathy in both hands" and reporting that plaintiff was "was unable to work" as of May 2008 and "need[ed] to be considered for

_____

[6] Plaintiff apparently terminated his counsel prior to the hearing date. (*See* R. 21.)

[7] Dr. Arevalo listed plaintiff's primary diagnosis as "[b]ipolar [disorder], depressed/anxious." (R. 309.) He also listed a secondary diagnosis that is partly illegible but appears to relate to substance dependency. (*Id.*)

disability" (R. 311). At some point before the hearing, plaintiff also submitted three pages of what appear to be largely his own handwritten notes referencing his bipolar disorder and medication and his belief that that disorder qualified him for Social Security benefits. (*See* R. 162-64.) The notes, some of which appear on a one-page "Discharge Plan" from Friends Hospital, also reference a future appointment with Dr. Cherayil at the Free Health Clinic and an appointment with "Wedge – out pt. psychiatry." (*See* R. 162-63.)

On May 22, 2008, the ALJ issued a written decision denying plaintiff's claims. (R. 9-18.) Applying the Social Security Administration's five-step sequential evaluation process for determining whether an individual is disabled, *see* 20 C.F.R. §§ 404.1520 & 416.920,[8] the ALJ concluded that plaintiff had not been under a disability within the meaning of the Social Security Act for the period from March 10, 2006, through the date of the decision. (R. 17.) The ALJ determined, at step two of the process, that plaintiff had a severe combination of impairments—namely, "residuals of stab wound, mild degenerative change at L4-5, and bipolar

---

[8] The SSA applies the same five-step process for DIB and SSI claims. *See Rutherford v. Barnhart*, 399 F.3d 546, 551 n.3 (3d Cir. 2005) (noting that the criteria at 20 C.F.R. § 416.920 are identical to the criteria set forth at 20 C.F.R. § 404.1520). The Third Circuit has summarized that process as follows:

> In the first four steps the burden is on the claimant to show that she (1) is not currently engaged in gainful employment because she (2) is suffering from a severe impairment [or combination of impairments] (3) that is listed in an appendix (or is equivalent to such a listed condition) or (4) that leaves her lacking the [residual functional capacity] to return to her previous employment. If the claimant satisfies step 3, she is considered per se disabled. If the claimant instead satisfies step 4, the burden then shifts to the Commissioner at step 5 to show that other jobs exist in significant numbers in the national economy that the claimant could perform.

*Id.* at 551 (internal citations omitted).

disorder, with history of alcohol, marijuana, cocaine and Xanax dependency (in remission)."

(R. 11.)  However, the ALJ concluded that plaintiff was not disabled because (1) his combination

of impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404,

Subpart P, Appendix 1 (R. 12), and (2) although plaintiff was unable to perform any past relevant

work, he retained the residual functional capacity to perform "entry level light work . . . which

does not involve complex or detailed tasks or more than minimal contact with the public/co-

workers," and jobs exist in significant numbers in the national economy that plaintiff can perform

(R. 12-17).

　　　In reaching his conclusions regarding plaintiff's residual functional capacity, the ALJ

gave "significant weight" to Dr. Abdollahian's assessment of plaintiff, and gave "substantial

weight" to the mental residual functional capacity assessment performed by Dr. Mrykalo and,

with certain exceptions discussed in greater detail in section III.B. *infra*, to Dr. Elinow's

assessment.[9]  (R. 15-16.)  Although the ALJ noted that the record also included opinions from

two of plaintiff's own doctors, Drs. Arevalo and Lo Bianco, he found these opinions to be of "no

probative value" in determining plaintiff's "maximum residual functional capacity" because

neither doctor had provided a "function by function analysis" of plaintiff's functional abilities

and limitations.  (R. 16.)

　　　On July 21, 2008, plaintiff, represented by his current counsel, requested review of the

ALJ's decision by the Appeals Council.  (R. 5, 203-06.)  Plaintiff contested the ALJ's failure to

accord substantial weight to Dr. Elinow's conclusions that plaintiff's impairment moderately

---

[9] The ALJ accepted Dr. Shah's physical residual functional capacity assessment of
plaintiff only to the extent that it was consistent with Dr. Abdollahian's opinions.  (R. 15.)

limited his ability to respond appropriately to work pressures in a usual work setting and to respond to changes in a routine work setting, and complete rejection of the opinions of Drs. Arevalo and Lo Bianco. (R. 203-05.) In support of his appeal, plaintiff submitted additional records from Dr. Lo Bianco, most of which appear to have been created after the ALJ issued his May 22, 2008, decision. (R. 205, R.313-21.) The Appeals Council denied plaintiff's request for review on February 9, 2009. (R. 1-3.)

Plaintiff thereafter sought judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). After plaintiff filed a motion for summary judgment, the court referred the matter to a magistrate judge, who issued an R & R, recommending that the motion for summary judgment be granted in part and denied in part. The magistrate judge rejected plaintiff's arguments that the ALJ failed to adequately ensure that plaintiff understood and knowingly waived his right to counsel (R & R 17-19), and failed to afford plaintiff a full and fair hearing in his handling of plaintiff's apparent misunderstanding of the role of the vocational expert (19-20) and in his conduct at the hearing, which plaintiff contends was disrespectful and biased in favor of the Commissioner (*see id.* at 21-22). The magistrate judge also rejected plaintiff's argument that the Appeals Council erroneously refused to review the case and to remand it to the ALJ based on additional evidence submitted to the Appeals Council, noting that virtually all of the additional evidence plaintiff submitted post-dated the ALJ's decision and thus did not relate to the time period for which benefits were denied.[10] (R & R 29-32.) The magistrate judge agreed with

_____

[10] As to the lone piece of new evidence that did not post-date the ALJ's decision—a half-page of treatment notes dated May 5, 2008 (*see* R. 319)—the magistrate judge concluded that as the notes contained little more than the information from Dr. Lo Bianco that was already before the ALJ, it was unlikely that the notes would have changed the ALJ's decision. (R & R 31-32.)

plaintiff, however, that he was not afforded a full and fair hearing due to the ALJ's failure to adequately develop the record as to plaintiff's treatment by Dr. Michael Lo Bianco, Wedge Medical Center, "CRI," and Friends Hospital (R & R 22-25), and failure to adequately question plaintiff's wife regarding how plaintiff's physical and mental health affect his daily life and ability to work (26-27). The magistrate judge also concluded that the ALJ erred in disregarding without a sufficient explanation Dr. Elinow's conclusion that plaintiff was moderately limited in his ability to respond to work pressures and/or changes in work setting.[11] (*Id.* at 27-28.) As a result, the magistrate judge recommended that the case be remanded to the ALJ for further development of the record and so that the ALJ could reevaluate and provide thorough explanations for his position regarding the relevant portions of Dr. Elinow's report.

The Commissioner has objected to the R & R in part on two grounds. First, the Commissioner objects to the magistrate judge's conclusion that the ALJ failed to adequately develop the record, asserting that any deficiencies in the record are plaintiff's own fault and that plaintiff has not shown that he was prejudiced by such deficiencies. (Def.'s Objections 2-3.) Second, the Commissioner objects to the magistrate judge's conclusion that the ALJ did not adequately explain his decision to reject portions of Dr. Elinow's opinion. (*Id.* at 4-5.) Plaintiff has not filed a response.

## II.    Legal Standard

The court reviews *de novo* those portions of the magistrate judge's R & R to which

---

[11] Plaintiff also argued that the ALJ erred in assigning "no probative value" to the assessments of plaintiff by Drs. Arevalo and Lo Bianco. (Pl.'s Mem. 16-17.) The magistrate judge concluded, however, that the weight to be accorded the doctors' opinions could not be determined until after the record had been adequately developed as to both doctors' treatment of plaintiff. (R & R 29.)

objection is made, and may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1). In contrast, the court's review of the ALJ's decision is deferential. On such review, the court must determine whether the ALJ's findings are supported by substantial evidence. *See Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003); 42 U.S.C. § 405(g). "'Substantial evidence' has been defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Reefer*, 326 F.3d at 379 (citation omitted). In reviewing the record for substantial evidence, the court "may not 'weigh the evidence or substitute [its own] conclusions for those of the fact-finder.'" *Rutherford*, 399 F.3d at 552 (quoting *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992)).

## III. Discussion

### A. ALJ's Development of the Administrative Record

The Commissioner first objects to the magistrate judge's conclusion that the ALJ failed to adequately develop the administrative record as to plaintiff's treatment by Dr. Lo Bianco, Wedge Medical Center, CRI, and Friends Hospital, and failed to adequately question plaintiff's wife. (Defs.' Objections 2-3.)

The Third Circuit repeatedly has recognized that an ALJ must "assume a more active role when the claimant is unrepresented." *Dobrowolsky v. Califano*, 606 F.2d 403, 407 (3d Cir. 1979); *see also Reefer*, 326 F.3d at 380; *Livingston v. Califano*, 614 F.2d 342, 345 (3d Cir. 1980). An ALJ "owes a duty to a *pro se* claimant to help him or her develop the administrative record." *Reefer*, 326 F.3d at 380; *see also Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) ("ALJs have a duty to develop a full and fair record in social security cases."). In particular,

"'[w]hen a claimant appears at a hearing without counsel, the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts.'" *Reefer*, 326 F.3d at 380 (quoting *Key v. Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985) (internal citation and quotation marks omitted)); *see also Ventura*, 55 F.3d at 902 ("[A]n ALJ must secure relevant information regarding a claimant's entitlement to social security benefits."). Although lack of counsel alone is not cause for remand when the claimant knowingly has waived the right to counsel, remand is appropriate when the lack of counsel prejudices the claimant or causes unfairness at administrative level, such as when the ALJ fails to adequately develop the administrative record. *Livingston*, 614 F.2d at 345.

The Commissioner argues that the ALJ in this case did fully develop the record by "inquiring about Plaintiff's physical and mental complaints and treatment, including from Dr. Lo Bianco, Wedge Medical Center, 'CRI,' and Friends Hospital," and that any deficiencies in the record are the fault of plaintiff, who "frequently interrupted the ALJ, and often changed subjects instead of answering the ALJ's questions." (Def.'s Objections 2.) The court cannot agree.

The court notes that plaintiff's testimony at the hearing was, by his own admission, "hard to follow." (Pl.'s Br. 11; *see also* R & R 22 (aptly characterizing the hearing transcript as "rife with interrupted and fragmented dialogue").) Nevertheless, although it was clear from plaintiff's testimony that he had been treated for mental health issues at Wedge Medical Center, CRI, and Friends Hospital (R. 50-51, 53-55, 58, 74-75), and that, at the time of the hearing, he was being treated for back problems by Dr. Lo Bianco (R. 37-39), the ALJ did not question plaintiff

regarding the duration or nature of the treatment provided.[12]  More importantly, there is no indication that the ALJ made any effort to obtain plaintiff's medical records from any of the treating sources he identified.  The need for such information was particularly important given the conflicting opinion evidence in the record regarding the extent to which plaintiff's medical and physical impairments limited his ability to work.  (*Compare* R. 308-09, 311 (opinions from plaintiff's doctors), *with* R. 270-85 (opinions from consultative doctors), *and* R. 286-91, 305-07 (physical and mental residual functional capacity assessments).)  By the time of the hearing, the record included an opinion from Dr. Arevalo of Wedge Medical Center that plaintiff was temporarily disabled due to his bipolar disorder, depression, and anxiety (R. 308-09), and an opinion from Dr. Lo Bianco that plaintiff was unable to work and should be considered for disability based on a combination of mental and physical impairments (R. 311).  Yet the ALJ had no underlying medical records from either doctor.[13]  Such records were necessary for the ALJ to evaluate the more conclusory opinion evidence he did have.[14]  Indeed, because of the absence of the underlying medical records and analysis, the ALJ found the cursory opinions to be of no

---

[12] Because the hearing transcript does not reflect the extent of plaintiff's treatment by each of the medical sources he identified, it is not clear whether any of these sources would qualify as a "treating source" whose opinions would be entitled to greater weight under the applicable regulations.  *See* 20 C.F.R. §§ 404.1502, 404.1527(d)(2), 416.902, 416.927(d)(2).

[13] While the record is not entirely clear on the point, it appears that plaintiff attempted, unsuccessfully, to provide the ALJ with psychotherapy notes relating to his treatment at Wedge Medical Center.  (*See* R. 51 (plaintiff referenced psychotherapy notes but then went on to describe an anxiety attack he had in Cardinal Rigaly's office).)

[14] Although opinions of medical sources on issues reserved to the Commissioner, such as the ultimate issue of whether a claimant is disabled, are not entitled to any special significance, the ALJ must "review all of the medical findings and other evidence that support a medical source's statement that [the claimant is] disabled."  20 C.F.R. §§ 404.1527(e), 416.927(e).

probative value. (R. 16.) Although the Third Circuit has declined to "say that an [ALJ] must search out all the relevant evidence which might be available," *Hess v. Sec'y of Health, Educ. & Welfare*, 497 F.2d 837, 840 (3d Cir. 1974), in the circumstances presented here, the ALJ should have obtained medical records from plaintiff's treating sources as part of his obligation to help the *pro se* plaintiff develop the administrative record. *See Reefer*, 326 F.3d at 380 (where medical records before ALJ did not refer to stroke *pro se* claimant testified she had suffered, ALJ had a duty to investigate further by requesting additional medical records or receiving testimony from plaintiff's treating physicians); *Isaac v. Astrue*, No. 08-1661, 2009 WL 1492277, at *13 (W.D. Pa. May 28, 2009) (ALJ failed to adequately develop the record where he relied on opinions by two consultative physicians without obtaining records from *pro se* claimant's mental health care provider); *Sloss v. Astrue*, No. 07-344, 2008 WL 2355853, at *2 (W.D. Pa. June 9, 2008) (ALJ failed to satisfy his enhanced duty to develop the record and hold a full and fair hearing by failing to seek records from mental health care provider that was listed by *pro se* claimant in her initial paperwork, discussed by claimant at the hearing, and noted in consultative physician's report).[15]

In addition to the heightened duty of care an ALJ owes when the claimant is

---

[15] In their summary judgment briefing, the parties disputed whether the ALJ had promised at the hearing to obtain some of plaintiff's medical records. (*See* Pl.'s Br. 8 (stating that ALJ had promised to get plaintiff's mental health records for him); Def.'s Resp. to Pl.'s Request for Review ["Def.'s Resp."] 12 (stating that it was plaintiff who stated that he would provide further records).) As the magistrate judge concluded (R & R 25-26), upon review of the record, it appears that it was plaintiff who stated that he would try to get his records himself (R. 66-67). The court notes, however, that the exchange regarding plaintiff's records appears to have been prompted by plaintiff's attempt to provide the ALJ with a completed request for a criminal record check so that the ALJ could obtain his medical and mental health records from his incarceration, during which time he suffered a nervous breakdown. (*See* R. 64-66.)

unrepresented, the ALJ is also obliged, under the applicable regulations, to ensure that the

claimant's complete medical history is developed for at least the twelve months preceding the

month in which the claimant filed his application. 20 C.F.R. §§ 404.1512(d), 416.912(d); *see*

*also* 42 U.S.C. § 423(d)(5)(B).[16] Thus, at a minimum, the ALJ should have obtained plaintiff's

medical records from those medical sources from which plaintiff received treatment in the twelve

months prior to October 2006, when plaintiff filed his applications for DIB and SSI.[17]

    The Commissioner also argues that remand is not warranted because plaintiff, who is now

---

[16] The regulations provide:

> Before we make a determination that you are not disabled, we will develop your
> complete medical history for at least the 12 months preceding the month in which
> you file your application unless there is a reason to believe that development of an
> earlier period is necessary or unless you say that your disability began less than 12
> months before you filed your application. We will make every reasonable effort
> to help you get medical reports from your own medical sources when you give us
> permission to request the reports.

20 C.F.R. §§ 404.1512(d), 416.912(d). The Commissioner's obligation to develop the claimant's
complete medical history for the preceding twelve months "for any case in which a determination
is made that the individual is not under a disability" also appears in the text of Title II of the
Social Security Act, 42 U.S.C. § 423(d)(5)(B), which further provides that Commissioner "shall
make every reasonable effort to obtain from the individual's treating physician (or other treating
health care provider) all medical evidence, including diagnostic tests, necessary in order to
properly make such determination, prior to evaluating medical evidence obtained from any other
source on a consultative basis."

[17] Although plaintiff did not list Wedge Medical Center, CRI, Friends Hospital, or Dr. Lo
Bianco as potential sources of medical records on his "Disability Report" (Form SSA-3368) (*see*
R. 172-74), he testified at the hearing regarding his diagnosis and/or treatment by each (R. 37-39,
50-51, 53-55, 58, 74-75). Even prior to the hearing, it was clear that Wedge Medical Center and
Dr. Lo Bianco were potential sources of medical records, as the administrative records included
opinions from both sources. (R. 308-09, 311.) The pre-hearing record also included references
to plaintiff's admission to Friends Hospital. (*See* R. 163 (Friends Hospital discharge plan), 308
(first page of employability assessment form indicating that plaintiff was diagnosed at Friends
Hospital with bipolar disorder).)

represented by counsel, has not presented any additional records that may be considered on remand and because there is no indication that any such documents or opinions exist.  (Def.'s Objections 3.)  Here, too, the court disagrees.  While the ALJ's failure to develop the record must have prejudiced the claimant in order for remand to be appropriate, *see Livingston*, 614 F.3d at 345, the Third Circuit has not required the claimant to produce the very records to be considered in order to show prejudice, *see Reefer*, 326 F.3d at 380 (remanding case based in part on ALJ's failure to develop the record regarding claimant's 1997 stroke, "an occurrence of obvious relevance to this disability determination," without addressing the contents of the records or testimony the ALJ should have obtained); *Dobrowolsky*, 606 F.2d at 407-08 (finding that claimant was prejudiced by his lack of counsel and by "the passivity of the ALJ as developer of evidence" due to ALJ's failure to call for additional evidence that might have demonstrated that claimant came within one of the *per se* qualifications for disability, but giving no indication as to what the additional evidence would have consisted of); *Jozefick v. Shalala*, 854 F. Supp. 342, 349 (M.D. Pa. 1994) (noting that the Third Circuit has remanded cases "in order to more fully develop the record without requiring the claimant to make a specific proffer of the evidence that would be presented to the ALJ on remand").

Rather, remand is appropriate when the ALJ "has failed to exercise his authority to attempt to fill significant evidentiary gaps that are material to the disability determination."  *Id.* Such is the case here.  Both Dr. Arevalo and Dr. Lo Bianco opined that plaintiff was at least temporarily unable to work as a result of his mental and physical impairments.  (R. 308-09, 311.) Dr. Arevalo stated that his assessment was based on "review of medical records," "clinical history," and "appropriate tests and diagnostic procedures" (R. 309), while Dr. Lo Bianco

reported that plaintiff was "under [his] care" for a variety of disorders (R. 311). It is thus fair to

infer that there exist underlying medical records from these sources that would support the

doctors' conclusions. In these circumstances, remand is appropriate so that the ALJ may further

develop the record regarding plaintiff's physical and mental impairments from his treating

sources.

The Commissioner also objects to the magistrate judge's conclusion that the ALJ failed to

adequately develop the record in his questioning of plaintiff's wife. (Def.'s Objections 2.) As

the magistrate judge noted, the ALJ's inquiries to plaintiff's wife at the hearing were minimal.

(R & R 26.) After admonishing plaintiff that the issue was whether plaintiff had "the ability to

do work" (R. 71-72), the ALJ proceeded to question plaintiff's wife on the narrow issue of

whether plaintiff had ever had mental health medications that helped him and whether she

thought that mental health medications might make a difference. (R. 72-73.) The ALJ did not

question plaintiff's wife about how his mental health issues affected his daily life and ability to

work, and he did not follow up on her testimony that plaintiff "can't work because of his slipped

disc and other—and his hands—. . .and everything is falling apart on him" (R. 73), even though

such testimony would have been relevant to the ALJ's determination of the extent of plaintiff's

impairments and their effect on his ability to work *See* 20 C.F.R. §§ 404.1513(d)(4),

416.913(d)(4) (noting that evidence from non-medical sources such as spouses may be used to

show the severity of the claimant's impairments and how they affect his ability to work). In view

of the court's conclusion that remand is required so that the ALJ may more fully develop the

record from plaintiff's treating sources, the court need not determine whether the inadequate

questioning of plaintiff's wife provides an independent basis for remand. On remand, however,

the ALJ should question plaintiff's wife on these topics. *See Reefer*, 326 F.3d at 381 (declining to decide whether ALJ's failure to obtain certain medical records, without more, would require remand where remand was otherwise warranted, but directing ALJ to obtain records on remand).

**B.    ALJ's Rejection of Certain of Dr. Elinow's Opinions**

The Commissioner also objects to the magistrate judge's conclusion that the ALJ failed to adequately explain his rejection of certain opinions in the report submitted by Dr. Elinow, the psychologist who examined plaintiff at the request of the state agency.  (Def.'s Objections 4-5.)

As part of his report, Dr. Elinow completed a form questionnaire concerning the extent to which plaintiff's impairments affected his ability to "understand, remember, and carry out instructions" and to "respond appropriately to supervision, co-workers, and work pressures in a work setting."  (R. 284.)  The form reflects Dr. Elinow's assessment that plaintiff (1) was not limited in his ability to understand, remember, and carry out short, simple instructions; (2) was "[s]light[ly]" limited in his ability to understand, remember, and carry out detailed instructions; to make judgments on simple work-related decisions; and to interact appropriately with the public and co-workers; and (3) was "[m]oderate[ly]" limited in his ability to interact appropriately with supervisors and to respond appropriately to work pressures and changes in a usual or routine work setting.  (*Id.*)

In determining plaintiff's residual functional capacity, the ALJ found Dr. Elinow's assessment to be "generally consistent with the evidence of record" and therefore accorded it "substantial weight," with the exception of Elinow's conclusions regarding plaintiff's ability to respond to work pressures and/or changes in the work setting.  (R. 15-16.)  The ALJ found that the evidence did not "clearly establish" that plaintiff's limitations in these two areas were

"moderate"; rather, he found only "slight" limitations in these areas.  (*Id.*)

"In making a residual functional capacity determination, the ALJ must consider all evidence before him." *Burnett v. Comm'r of Soc. Security Admin.*, 220 F.3d 112, 121 (3d Cir. 2000).  An ALJ may accept some of a medical source's opinions while rejecting other opinions from the same source. *See Johnson v. Comm'r of Soc. Security*, 529 F.3d 198, 202-04 (3d Cir. 2008) (upholding ALJ's decision to credit some, but not all, of claimant's treating physician's opinions).  However, an ALJ "may not reject pertinent or probative evidence without explanation," *id.* at 204; may not "'reject evidence for no reason or for the wrong reason,'" *Rutherford*, 399 F.3d at 554 (quoting *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993)); and "is not free to employ her own expertise against that of a physician who presents competent medical evidence," *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999).

The Commissioner argues that "[w]hile the ALJ did not discuss each finding and opinion by Dr. Elinow, he provided adequate information to demonstrate that he considered Dr. Elinow's findings and opinions in their entirety."  (Def.'s Objections 4.)  As noted, however, the ALJ did in fact discuss the particular opinions by Dr. Elinow at issue.  (R. 15-16.)  The issue, therefore, is whether the ALJ's explanation for his rejection of those opinions is adequate and whether his own findings regarding plaintiff's ability to respond to work pressures and/or changes in the work setting are supported by substantial evidence.

The ALJ rejected Dr. Elinow's opinions that plaintiff was moderately limited in his ability in these areas as not "clearly establish[ed]" by the evidence.  (R. 15-16.)  However, he did not identify any evidence that contradicted Elinow's findings or supported his own opinion that plaintiff had only "slight limitations in these areas."  (*See id.*)  Moreover, as the magistrate judge

noted, the ALJ's rejection of Dr. Elinow's opinions is inconsistent with his treatment of the mental residual functional capacity assessment of plaintiff prepared by Dr. Mrykalo. (R & R 27-28.) Like Dr. Elinow, Dr. Mrykalo found that plaintiff was "[m]oderately [l]imited" in his ability to respond appropriately to changes in the work setting. (R. 306.) Yet the ALJ accepted Mrykalo's assessments without exception—including his assessment regarding plaintiff's ability to respond to changes in the work setting—finding them to be "consistent with and supported by the evidence of record in its entirety" and thus according them "substantial weight."[18] (R. 15.)

The ALJ's conclusory explanation for his decision to disregard certain of Dr. Elinow's conclusions is particularly inadequate in light of his endorsement of one of the same conclusions by Dr. Mrykalo. Indeed, given the ALJ's acceptance of the mental residual functional capacity assessment of plaintiff in its entirety, the court cannot say that the ALJ's findings regarding plaintiff's ability to respond to work pressures and/or changes in the work setting are supported by substantial evidence. Accordingly, on remand, the ALJ should reevaluate his treatment of the relevant portions of Dr. Elinow's report and provide a thorough explanation for his position. The ALJ should also consider the effect of any change in his treatment of Dr. Elinow's report on his assessment of plaintiff's residual functional capacity.

## IV. Conclusion

As set forth above, by conducting only limited questioning of plaintiff regarding

---

[18] In fact, to the extent that there are inconsistencies between Dr. Elinow's report and the mental residual functional capacity assessment, it is because Dr. Mrykalo found plaintiff to be limited to a greater degree as a result of his impairments than Dr. Elinow. (*Compare* R. 305-06 (Dr. Mrykalo's assessment finding that plaintiff was "[m]oderately [l]imited" in his ability to understand, remember, and carry out detailed instructions; to make simple work-related decisions; and to interact appropriately with the general public), *with* R. 284 (Dr. Elinow's report finding only "[s]light" limitations in these areas).)

treatment he received for his mental and physical impairments from Wedge Medical Center, CRI, Friends Hospital, and Dr. Lo Bianco, by failing to obtain plaintiff's underlying medical records from any of these medical sources, and by conducting only minimal questioning of plaintiff's wife regarding extent of plaintiff's impairments and their effect on his ability to work, the ALJ failed to fulfill his duty to assist the *pro se* plaintiff in developing the record. The ALJ also failed to adequately explain his decision to discount certain of Dr. Elinow's findings regarding the extent of plaintiff's limitations, despite having accepted similar findings in the mental residual functional capacity assessment of plaintiff. Accordingly, the court will adopt the recommendations of the magistrate judge and remand the case to the ALJ for further consideration consistent with this memorandum. An appropriate order accompanies this memorandum.